**SEAN C. MCGUIRE**
California State Bar No. 319521
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Sean_McGuire@fd.org

Attorneys for Ms. Tabares

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FRANCIA ELENA TABARES-SALINAS,<br><br>Defendant. | CASE NO.:  3:20-CR-437-WQH<br><br>Hon. Karen S. Crawford (Magistrate)<br>Hon. William Q. Hayes (District Judge)<br><br>**MOTION TO REOPEN THE DETENTION HEARING UNDER 18 U.S.C. § 3142(f)** |

Francia Elena Tabares-Salinas hereby respectfully requests that the Court reopen her detention hearing under 18 U.S.C. § 3142(f). The statute provides for reopening of such hearings "at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing" and if that information is material to the issue of release. *See* 18 U.S.C. § 3142(f).

Ms. Tabares is a pretrial defendant within the group of people most at risk of serious illness or death from the COVID-19 virus, because she is 56 years old and in poor health. As explained below, local detention facilities in and near San Diego face a heightened possibility of infection. The Fifth, Sixth, and Eighth Amendments, Bail Reform Act, and humanitarian concerns counsel in favor of releasing Ms. Tabares on personal recognizance or other conditions that will permit her release.

**I.     The Court ordered Ms. Tabares detained at the initial appearance, but Ms. Tabares has community ties and an ability to make bond.**

This Court previously ordered Ms. Tabares detained. Through counsel's diligent efforts and investigation, we have secured potential U.S. Citizen sureties and are ready to post a reasonable bond to secure Ms. Tabares's release. Her U.S. citizen husband lives in Los Angeles, and her adult children live and work there as well.

Ms. Tabares was kidnapped from her home at age 14 and held as a sex slave by a vicious drug kingpin for many decades. Her association with him led to her previous criminal convictions. The conviction stemming from 2009 is especially problematic because the lawyer who represented her in that case was ineffective. He never met with her, he never explained the charges against her, and in fact he has since been disbarred by the State of New York in a published order. *See In re Kulscar*, 123 A.D.3d 251 (2014) (holding that disbarment of defense attorney Roy R. Kulscar was appropriate). These convictions, in other words, have no bearing on Ms. Tabares's risk of flight or danger to the community, and should be disregarded.

She has spent the majority of her adult life in fear—a fear that only began to dissipate when her tormentor finally died in prison some years ago. Since then, she has been trying to build some semblance of a normal life. Most recently she has been living with an aunt in Mexico. In part due to the violence that her family faced when she was in the clutches of the cartel, her family—ironically—was granted various forms of immigration relief in the late 1990's. She has every incentive, in other words, to abide by the court's orders, remain at home, and quietly await the passing of the pandemic.

Ms. Tabares has been in custody for 99 days—that's three months, one week, and two days.

**II.    Ms. Tabares is at a high risk of dying or hospitalization from COVID-19 without self-quarantine at home.**

COVID-19 is more dangerous for some than others. Unfortunately, Ms.

Tabares is in the category of people who are in a great deal of danger upon contracting this contagious disease. Ms. Tabares is nearly fifty-seven years old and in poor health: she occasionally experiences high blood pressure and shortness of breath.

COVID-19 is an illness from which most people recover. Among all people with confirmed cases, existing information shows that about 80% experience mild symptoms, 20% are severely or critically ill, and roughly 2% die.[1] Within these general statistics, however, two categories of people are vastly more likely to suffer severe symptoms or die: older people, and people with chronic medical conditions.

Older people with coronavirus are more likely to die. As of the beginning of March, those diagnosed with coronavirus between the ages of 60 and 69 had a 3.6% risk of dying; those between 70 and 79 had an 8% chance of dying; and those 80 or above had a 14.8% chance of dying.[2]

Older people diagnosed with coronavirus are also much more likely to be very sick. The median age of someone hospitalized with coronavirus is 66, whereas the median age of someone with more mild symptoms is 51.[3] People who need to be hospitalized have an array of severe symptoms, including acute respiratory distress, cardiac injury, arrhythmia, septic shock, liver dysfunction, acute kidney

---

[1] *See* Centers for Disease Control and Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVI-19)*, March 7, 2020 ("CDC Interim Clinical Guidance"), available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html; European Centre for Disease Prevention & Control, *Daily risk assessment on COVID-19*, 12 March 2020, available at https://www.ecdc.europa.eu/en/current-risk-assessment-novel-coronavirus-situation ("ECDPC Daily Risk Assessment"); Novel Coronavirus Pneumonia Emergency Response Epidemiology Team, *The Epidemiological Characteristics of an Outbreak of 2019 Novel Coronavirus Diseases (COVID-19) in China*, 41 Zhonghua Liu Xing Bing Xue Za Zhi 145, Feb. 17, 2020, available at https://pubmed.ncbi.nlm.nih.gov/32064853-the-epidemiological-characteristics-of-an-outbreak-of-2019-novel-coronavirus-diseases-covid-19-in-china/.

[2] CDC Interim Clinical Guidance, at "Clinical Presentation."

[3] *Id.* at "Clinical Course."

injury, and multi-organ failure.[4] Of those admitted to a hospital for coronavirus, the majority are so sick as to be placed on mechanical ventilators; many others receive various advanced organ support.[5]

People with chronic medical conditions, no matter their age, are also at significantly greater risk from COVID-19. Slightly less than one percent of those diagnosed with coronavirus, but no other major underlying medical conditions, have died.[6] By contrast, 6% of those with chronic respiratory disease, hypertension, or cancer died. Of those with diabetes, 7% died. And 10.5% of those with cardiovascular disease died.[7]

Based on this evidence, significant risk factors for progressing to more severe illness after contracting COVID-19 appear to include "older age, and underlying chronic medical conditions such as lung disease, cancer, heart failure, cerebrovascular disease, renal disease, liver disease, diabetes, immunocompromising conditions, and pregnancy."[8]

That is why the CDC urges that it is "extra important" for older people and those with chronic medical conditions "to take actions to reduce [their] risk of getting sick with the disease."[9] The CDC has explained that people in this higher risk category must "[a]void crowds as much as possible" and "stay home as much as possible," particularly once there is a COVID-19 outbreak in their community.[10] There is general consensus in the public health community in California and San Diego that the most important thing for those at risk of severe illness or death from

---

[4] *Id.*
[5] *Id.*
[6] *Id.* at "Clinical Presentation."
[7] *Id.*
[8] *Id.* at "Clinical Management and Treatment."
[9] Centers for Disease Control and Prevention, *People at Risk for Serious Illness from COVID-19*, available at https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html.
[10] *Id.*

4                                              3:20-CR-437-WQH
MOTION TO REOPEN THE DETENTION HEARING

COVID-19 to do is to stay home, away from groups of 10 or more people.[11]

### III. Local detention facilities are more likely to become infected and are ill-prepared to help people like Ms. Tabares avoid contracting COVID-19.

Conditions of pretrial confinement create the ideal environment for the transmission of contagious disease.[12] Prisons and jails "have become breeding grounds for infectious epidemics, with severe consequences for both prisoners and the public alike."[13] According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[14]

Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[15] In China, officials have confirmed the coronavirus spreading at a rapid pace in Chinese prisons, counting 500 cases.[16]

---

[11] *See, e.g.*, California Department of Public Health, COVID-19 Notice, March 11, 2020, available at https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/Gathering_Guidance_03.11.20.pdf (recommending that, in California, "[g]atherings of individuals who are at higher risk for severe illness from COVID-19 should be limited to no more than 10 people"); José A. Alvarez, County of San Diego Communications Office, *Social Distancing, Visiting Restrictions Established*, March 12, 2020, available at https://www.countynewscenter.com/social-distancing-visiting-restrictions-established-mass-gatherings-banned-5-more-positive-covid-19-cases-reported-locally/ (same).

[12] Joseph A. Bick, Infection Control in Jails and Prisons, 45 *Clinical Infectious Diseases* 1047, 1047–55 (2007), available at https://doi.org/10.1086/521910.

[13] John E. Dannenberg, *Prisons as Incubators and Spreaders of Disease and Illness*, Prison Legal News, August 15, 2007, available at https://www.prisonlegalnews.org/news/2007/aug/15/prisons-as-incubators-and-spreaders-of-disease-and-illness/.

[14] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," Mar. 2, 2020, available at https://bit.ly/2W9V6oS.

[15] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge, Mar. 7, 2020, available at https://bit.ly/2TNcNZY.

[16] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*,

1   Anecdotal experience in the Southern District confirms this risk exists here
2   too: local detention facilities commonly suffer widespread infections from illnesses
3   such as chicken pox and influenza, while tuberculosis remains an ongoing concern
4   requiring screening before appearance in court. That risk is particularly concerning
5   given the population of detainees in the Southern District, where high numbers of
6   individuals arrive from other countries with poor or non-existent medical care.
7   Moreover, many detainees lack the education, information, and language skills to
8   communicate effectively that they might be suffering symptoms indicative of
9   COVID-19. As a result, coronavirus infection in our local detention facilities is a
10  near certainty in the coming days and weeks.

**IV.  In light of the likelihood of and risk from infection, this Court should reverse the detention order and grant conditions of release to prevent unnecessary harm to Ms. Tabares.**

Ms. Tabares is not a danger to the community, and new information not presented at the detention hearing can reassure the court that she is not a risk of flight: if released on bond, she can live with her family in Los Angeles. A pandemic has arrived in San Diego posing a direct and heightened risk to Ms. Tabares from continued detention. This Court should ensure she is released from custody to practice life-saving social distancing.

Under the Bail Reform Act, this Court "may at any time amend the order to impose additional or different conditions of release." 18 U.S.C. § 3142(c)(3). It also must take into account a defendant's "physical and mental condition." *Id.* at § 3142(g)(3)(A). Ms. Tabares recognizes that remaining out of custody is a matter of life and death, providing significant incentive for Ms. Tabares to comply with any conditions of release set by the court and not risk a bench warrant and further detention. That incentive, in turn, provides ample reason for this Court to set a lower-than-usual financial condition to ensure absolutely that Ms. Tabares is not

---

Business Insider, Feb. 21, 2020, available at https://bit.ly/2vSzSRT.

kept incarcerated by her poverty.

In addition, continued detention raises constitutional concerns. The Eighth Amendment bars "cruel and unusual punishments," to include deliberate indifference to unsafe, life-threatening conditions. *See generally*, *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014). "That the Eighth Amendment protects against future harm to inmates is not a novel proposition." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). "[A] remedy for unsafe conditions need not await a tragic event." *Id*. At bottom, the Eighth Amendment forbids holding a frail individual at risk of death in in an unsanitary detention facility in the absence of any danger to the community or serious risk of flight.

The Fifth and Sixth Amendment rights to due process and counsel further weigh against Ms. Tabares's continued detention. The Ninth Circuit has explained that "[a] prisoner's right of access to the courts includes contact visitation with his counsel." *Ching v. Lewis*, 895 F.2d 608, 610 (9th Cir. 1990). The Otay Mesa Detention Facility, run by private company CoreCivic, has informed counsel that legal visitation is strongly encouraged to be conducted through non-private phones in their video conference room. This room contains nearly twenty video phone units, each connected to a different pod. The visits are unlikely, therefore, to be private if multiple attorneys need to see multiple clients in multiple different pods. Demonstrating the seriousness of the outbreak, the Metropolitan Correctional Center in downtown San Diego has informed counsel that all legal visitation is suspended from March 13 until at least April 13 because of the risk posed by COVID-19, and other detention facilities are likely to follow suit. Ordering Ms. Tabares released will allow her to meet with counsel in a safe, sanitary environment, and thus fulfill the mandates of the Fifth and Sixth Amendments.

In light of these considerations, this Court should release Ms. Tabares on personal recognizance and subject to any further conditions of supervision that may reduce the risk of flight without de facto detaining.

**V.     Only if the court is unwilling to grant personal recognizance release, Ms. Tabares requests an emergency hearing.**

COVID-19 spreads quickly and kills quickly.  If the Court is not willing to grant release on personal recognizance, Ms. Tabares requests an emergency hearing on this motion.

Respectfully submitted,

Dated:  March 18, 2020          */s/Sean C. McGuire*

**SEAN C. MCGUIRE**
Federal Defenders of San Diego, Inc.
Sean_McGuire@fd.org
Attorneys for Ms. Tabares